**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LONDON DIVISION**

IN RE

JODIE NICOLE WALTERS                                             CASE NO. 19-60350

DEBTOR

MIKE JORDAN                                                              PLAINTIFF

V.                                                                                ADV. NO. 19-6016

JODIE NICOLE WALTERS                                             DEFENDANT

**MEMORANDUM OPINION**

The Plaintiff Mike Jordan alleges the Defendant Jodie Nicole Walters owes a non-dischargeable debt for construction performed on her home pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6). Walters counterclaims for damages based on the poor quality of Jordan's work. A trial was held on July 7, 2020. Jordan failed to satisfy his burden of proof, so the underlying claim is dischargeable. Further, Walters is entitled to recover damages on her counterclaim because Jordan's work was materially defective and unworkmanlike.

**I.     FACTS.**

    **A.     The Restoration Proposal.**

In early August 2018, Walters sustained fire damage to her home in Knox County, Kentucky. She submitted a claim to Kentucky National Insurance Company ("Kentucky National"). Kentucky National prepared an itemized estimate that reflects a total replacement cost of $81,747.67. [ECF No. 82 at ¶ 5; ECF No. 77-1, Def. Exh. 1; ECF No. 85-2, Plf. Exh. 2.]

On or around August 25, 2018, Walters retained Jordan to restore her home. [ECF No. 82 at ¶ 4.] They agreed that Walters would pay Jordan from the Kentucky National insurance

proceeds based on the estimate, provided his efforts were workmanlike and not defective. [ECF No. 82 at ¶ 6.] Consistent with that agreement, Walters and Jordan executed a document labeled "Proposal" that contained the following handwritten provision:

> JODIE HAS GIVEN US PERMISSION TO SETTLE CLAIM WITH INSURANCE AND DEAL DIRECTLY WITH MORTGAGE COMPANY AND COMPLETE SCOPE OF REPAIRS LAID OUT AND PAID FOR BY THE INSURANCE COMPANY.  ANY ADDITIONAL WORK WILL BE ADDRESSED AT TIME OF DESION [SIC] AND WILL BE PAID UPON OF [SIC] COMPLETION.
>
> PAYMENTS AS FOLLOWS 50% DOWN BALANCE UPON COMPLETION OF THAT PHASE OF PROJECT.

[ECF No. 85-1, Plf. Exh. 1 (capitalized in original).]

### B. The Restoration Process.

Walters and her family moved out of the home following the fire and into temporary housing. Kentucky National agreed to pay for the temporary housing, but only for a limited period. Jordan understood he had to expeditiously complete repairs before Walters exhausted her temporary housing insurance benefits.

Jordan worked on the project from late August 2018 to late January 2019. Jordan testified that he, his construction crew, and occasional day laborers worked on Walters' home six or seven days a week during much of this period. Jordan and his crew first tore out the damaged property and hauled it away. They then started rebuilding the home by installing new drywall, floors, and ceilings, framing and replacing windows and doors, painting, adding new fixtures, and installing new electric and plumbing. Walters' insurance paid for vinyl siding repairs, but Jordan was not responsible for this task.

Walters also asked for additional repairs and upgrades not listed on the Kentucky National estimate. Jordan reconfigured the floorplan, leveled the living room floor, and installed

two pocket doors, a jacuzzi tub, and bathroom tile.  Walters paid for the materials, but Jordan did not charge (or at least did not pursue a claim) for his labor.

Insurance for alternate housing was originally scheduled to lapse in December 2018 and Jordan assured Walters he would complete the project by Christmas.  Jordan did not meet that deadline, so Kentucky National extended Walters' temporary housing through January 2019.  Walters was told it was the last extension.  Walters was scheduled to give up her temporary housing on January 29, and Jordan rushed to complete the project.

Walters remained in contact with Jordan throughout the project.  Walters started noticing various problems with Jordan's work during 2018.  Walters communicated her concerns verbally and through text messages in December 2018 and January 2019.  She repeatedly raised issues with the repairs that included complaints about ripped vinyl flooring, rough and messy drywall, cracks between the trim and the drywall, plumbing that was not concealed, and incorrect light fixtures.  Jordan either requested additional money to fix the problems or dismissed her concerns.

### C. Terms and Manner of Payment for Restoration.

The Proposal provided that Jordan would receive payment from the insurance proceeds after he completed each phase of the project.  The insurance money was distributed through multiple checks issued by either Kentucky National or Flagstar Bank, Walters' mortgage company.  [ECF No. 77-3, Plf. Ex. 3; ECF No. 77-4, Pfl. Ex. 4; ECF No. 82 at ¶ 7.]  The Kentucky National checks were made payable to Walters, or Walters and Flagstar Bank.  The Flagstar Bank checks were always made payable to Jordan and Walters.

Approval by an insurance adjuster or the mortgage company was necessary before funds were released, so Jordan was not always paid immediately upon completion of each phase of the project.  Several times, Walters advanced her own funds when Jordan needed money for

materials or to pay his workers. Walters would reimburse herself when the next insurance payment was received and deliver the remaining funds to Jordan.

Jordan and Walters met at her bank to cash checks made payable to both and disburse funds to Jordan. Walters cashed the checks made payable to her and, after the two-day hold period passed, paid Jordan. All the insurance proceeds were deposited and paid from Walters' bank account, except for one check that was negotiated for cash and paid directly to Jordan because he needed the money.

Walters gave Jordan permission to speak to Kentucky National in the Proposal and she encouraged him to do so during the project. Despite this, Jordan repeatedly asked Walters for more funds to continue the project. In December and January, Walters was handling almost all communication with the insurance company and mortgage lender. This exacerbated delays because Jordan needed to confirm the extent of construction and absence of liens before money was disbursed.

The parties' relationship broke down after Walters moved back into her home. Jordan repeatedly harassed Walters for the final payment. Walters responded with concerns about the quality of the construction, but also worked with Kentucky National to obtain the remaining insurance proceeds. Kentucky National issued the final check for $14,204.59 on February 2, 2019.

On February 25, 2019, Jordan met Walters at her place of employment. She informed Jordan that she did not want him to perform any more work on her home based on his behavior and the issues she raised with his performance. She suggested that they split the check and walk away from the relationship. Jordan became angry and took the check from her. An argument ensued and the police were called.

The final check was never cashed and is no longer valid. Kentucky National continues to hold the insurance proceeds and has declined to pay any of the money to either party until this litigation is resolved. [ECF No. 82 at ¶ 8.]

    **D.**    **The Bankruptcy Filing and Adversary Proceeding.**

Walters filed her chapter 7 petition on March 21, 2019. She listed Jordan as an unsecured creditor on Schedule E/F. Jordan's amended complaint seeks a judgment that the debt owed to him is non-dischargeable under §§ 523(a)(2)(A) and 523(a)(6). [ECF No. 26.] Walters denies the allegations and counterclaims for damages to cure and repair "the shoddy, defective, negligent, careless, and unworkmanlike construction." [ECF Nos. 6, 16, 35.]

The Court took the amended complaint and counterclaim under submission following the July 7 trial. A decision on Walters' request for a directed verdict made after Jordan completed his proof is unnecessary based on this ruling.

**II.**    **JURISDICTION.**

The Court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. § 1409.

Jordan and Walters consented to the bankruptcy court's jurisdiction. [ECF Nos. 1, 26; ECF Nos. 16, 35.]

**III.**    **DISCUSSION.**

    **A.**    **Jordan Did Not Meet His Burden of Proof Under § 523(a)(2)(A).**

Count I of the amended complaint seeks a determination that a debt Walters owes to Jordan is non-dischargeable under § 523(a)(2)(A). "A discharge under section 727....of this title does not discharge an individual debtor from any debt- …

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by

5

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtors or an insider's financial condition ...

11 U.S.C. § 523(a)(2)(A).

Jordan must prove the following by a preponderance of the evidence to succeed under § 523(a)(2)(A):

> (1) Walters obtained money through a material misrepresentation that at the time, Walters knew was false or made with gross recklessness as to its truth;
> (2) Walters intended to deceive Jordan;
> (3) Jordan justifiably relied on the false representation; and
> (4) Jordan's reliance was the proximate cause of his loss.

*Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-281 (6th Cir. 1998). Exceptions to discharge are strictly construed against the creditor. *Id.* at 281.

Jordan argues that Walters skimmed funds from the insurance proceeds. But Walters produced bank records that show she made almost dollar-for-dollar disbursements to Jordan, except for delivery of the final check for $14,204.59. Jordan admitted the final payment was the only amount in controversy.

Withholding the final payment was reasonable considering the poor quality of Jordan's work and his overreaction resulting in the police presence. [*See infra* at Part III.C (regarding Jordan's performance).] Also, at the end of the trial, Jordan's counsel acknowledged Walters' testimony was sufficient to overcome Jordan's § 523(a)(2)(A) argument. Therefore, Jordan failed to meet his burden of proof and judgment shall enter for Walters on Count I of the amended complaint.

### B.     Jordan Did Not Meet His Burden of Proof Under § 523(a)(6).

Count II of the amended complaint seeks a determination that a debt Walters owes to Jordan is non-dischargeable under § 523(a)(6). Section 523(a)(6) provides:

> A discharge under section 727....of this title does not discharge an individual debtor from any debt- …
>
> ….
>
> (6)  for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6). Jordan has the burden to prove by a preponderance of the evidence that his loss is the result of conduct by Walters that is both willful and malicious. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998); *MarketGraphics Research Grp., Inc. v. Berge (In re Berge)*, 953 F.3d 907 (6th Cir. 2020); *Bank of Kentucky, Inc. v. Nageleisen (In re Nageleisen),* 523 B.R. 522, 529 (Bankr. E.D. Ky. 2014).

Jordan argues that Walters acted willfully and maliciously when she failed to turn over the insurance proceeds. But the Proposal only required payment if Jordan's "work was workmanlike and not defective" [ECF No. 82 at ¶ 6] and, as discussed below, Walters was justifiably dissatisfied with Jordan's work. Therefore, withholding the final payment does not evidence a willful and malicious intent to harm Jordan. *See, e.g., Salem Bend Condo. Assoc. v. Bullock-Williams (In re Bullock-Williams)*, 220 B.R. 345, 347 (B.A.P. 6th Cir. 1998) (failure to make payment without proof of an intent to cause harm is not willful and malicious); *Rhoades v. Pangborn* (*In re Pangborn*), Bankr. No. 05-25045, Adv. No. 05-6237, 2008 WL 782805, at *2 (Bankr. D. Kan. Mar. 19, 2008) (failure to pay for defective workmanship does not support a finding of willful and malicious injury without evidence of intent to harm).

Jordan failed to meet his burden of proof under § 523(a)(6) and judgment shall enter for Walters on Count II of the amended complaint.

### C. Walters Met Her Burden to Prove the Defective and Unworkmanlike Quality of Jordan's Work.

Walters counterclaims for damages suffered as a result of the defective and unworkmanlike quality of Jordan's performance. The evidence confirms the work was substandard and Walters is entitled to damages.

#### 1. Jordan Did Not Perform the Construction in a Workmanlike Manner.

A contractor has a duty to perform his duties in a proper and workmanlike manner. *Shreve v. Biggerstaff*, 777 S.W.2d 616, 617 (Ky. Ct. App. 1989) (citing 17A C.J.S. *Contracts* § 494(2)b at 714-15). A contractor that fails to perform in a workmanlike manner is liable for defects resulting from the failure despite completing the work to the best of his skill, knowledge, and ability. *Id.* The measure of damages is the reasonable cost of remedying the defect. *Murray v. McCoy*, 949 S.W.2d 613, 614-15 (Ky. Ct. App. 1996).

Walters' testimony and corresponding pictures show a laundry list of inexcusable defects. The following is a summary of the defects in Jordan's work that Walters established through her testimony and photographs admitted into evidence:

- Exterior Doors and Hardware. There are large gaps between the front and back doors and their door frames. One gap is large enough for Walters' hand. Walters also testified she had to plane the bottom of the back door so she could close and lock it.

- Closet Doors. Walters testified that Jordan did not install one closet door and multiple other closet doors do not function properly. The poor installation caused the paint to wear off. One photograph reflects shoddy framing. The pictures also show visible damage to a door from relocation of the hinges.

- Pantry and Cabinet Doors. Walters purchased doors for her pantry in October, weeks before Jordan performed any work on the surrounding area. But Jordan did not adequately account for spacing, so the doors do not fully open and

8

limit Walters' access. A similar problem affects a kitchen cabinet, which does not open or close properly and sticks on a support beam. Jordan also installed a pocket door that sticks because the wall he built is slanted.

- <u>Ceilings</u>. There is no seamless connection to the metal ceiling. Walters testified that she asked for popcorn ceilings and Jordan left ceilings smooth. The mudding on multiple ceilings in the home is rough and unfinished.

- <u>Drywall</u>. Walters testified that screws are still visible in the drywall, the mudding is not smoothed, and it is possible to see dried paint drips. Multiple pictures confirm the rough and unfinished drywall in the closets and other areas of the home. The pictures also show visible dents, holes, and scuffs.

- <u>Lighting</u>. Walters asked Jordan to install recessed lighting in her bedroom closets and foyer. Jordan installed a bare lightbulb in her bedroom closet that was not recessed. In a different closet, Jordan could not figure out the wiring for a switch, so he told Walters she must accept a pull chain. The pictures of the various light installations show visible gaps between the fixtures and ceiling.

- <u>Water Heater</u>. Jordan installed a new water heater in the middle of a room and did not conceal the water lines that extend up to the ceiling. Walters had to purchase foam to cover the gaps left in the ceiling.

- <u>Flooring</u>. One picture shows a very large rip in the flooring by the water heater and a clear attempt to cover it up. The floor has molded as a result. The pictures also show that the vinyl flooring is coming apart. Walters testified that her floors are not level.

- <u>Master Bathroom</u>. The tile in the master bathroom is not sealed and the grout is chipping. The tile was not graded properly so water pools on the shower floor.

Walters brought many of these issues to Jordan's attention during construction, but he rebuffed her requests for repair. Jordan claimed Walters authorized the single coat, sloppy mudding in the closets due to time constraints, but Walters raised issues with the drywall and ceilings throughout the house. Walters asked Jordan to address the visible water lines around the water heater, but he said it was "too late to fix." When she complained about the incorrect wiring, Jordan told her that he could not figure out the problem and his work was "the best I can do."

9

Jordan suggested he could have fixed most or all of Walters' complaints after she moved in. Walters said, however, that the poor quality of the prior work did not instill confidence he could or would fulfill his promises. Also, once Jordan overreacted and the police became involved, Walters would not allow him in her house. Walters' testimony regarding these issues was more credible and Jordan's testimony was less candid.

The pictures strongly support Walters' testimony about the sloppy and defective work. The best example is the drywall. The pictures of the drywall do not reflect minor imperfections. The work is obviously shoddy and incomplete. No reasonable person would find drywall in this condition acceptable in a closet or otherwise.

Jordan admitted that he rushed to finish the job and maintains that he did the best he could under the circumstances. But when the best is of poor quality, it is insufficient. *Shreve*, 777 S.W.2d at 617. Walters never agreed to accept less than work performed in a workmanlike manner and Jordan's work was below any minimum standard of expectation.

### 2. Walters Proved She Is Entitled to Money Damages.

Walters introduced the testimony of Timothy Hood of HD Construction, LLC. Hood examined her home and prepared an estimate to repair the damage caused by Jordan's substandard work. Walters did not introduce Hood as an expert, but his substantial experience supports his testimony as a fact witness. Jordan did not challenge Hood as a fact witness and his testimony was credible.

Hood estimated the cost of leveling all floors at $9,500.00. But Jordan was only paid to level the living room floor and align it with the kitchen and dining room area. Further, the house was built approximately 50-60 years ago, so Hood conceded some settling is expected. Hood

also admitted that he did not go into the crawlspace or tear up the floor to find out the root cause. Based on this, no damages are allowed for this line item.

Hood testified that fixing drywall would cost $8,500.00 and repainting the walls and ceilings would cost $3,800.00. The proof supports allocation of $12,300.00, the full estimate of the repairs.

Hood estimated repairs to the doors and hardware at $1,800.00, and repair to the cabinets and trim at $3,900.00. The evidence shows very poor workmanship and significant damage for these items and Jordan's attempt to justify his work is unconvincing. The full amount of the estimate for these damages, $5,700.00, is reasonable.

Hood estimated the cost to fix the electrical issues is $3,500.00. Rewiring and other electrical work is required, considering the improper installation of lighting. But Hood conceded that he could not gauge the full extent of the problem without removing drywall, which did not occur. Also, there was conflicting testimony regarding the integrity of the overall electrical work and compliance with local government codes. Therefore, this estimate is reduced by 50% to $1,750.00.

Hood assessed $2,200.00 to repair the tile in the master bathroom shower. It is likely Jordan sealed the tile in the master bathroom before it was properly cured. But Jordan explained that the puddling occurred because the floor of the 3 x 3 shower was an exposed rock aggregate. There is not enough information to allocate damages for this line item.

Based on the foregoing, the Court finds that Walters is entitled to damages to repair Jordan's defective work in the amount of $19,750.00.

**III.     CONCLUSION.**

Walters is entitled to a judgment in her favor on Counts I and II of the amended complaint and the counterclaim.  In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits, and arguments of counsel, regardless of whether or not they are specifically referred to in this decision.  A separate Judgment shall be entered accordingly.

___

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Gregory R. Schaaf*
**Bankruptcy Judge**
**Dated: Thursday, July 23, 2020**
(grs)